## Staunton.

### FRAZIER V. FRAZIER AND ALS.

October 11th, 1883.

| 77 | 775 |
| 89 | 789 |
| 77 | 775 |
| 101 | 35 |

1. APPELLATE JURISDICTION—*Construction of Statutes.*—Final decree rendered 30th November, 1880. Record for appeal presented 28th November, 1881, to a judge of this court. The judge endorsed that fact the same day on the record, and 24th April, 1882, he also endorsed thereon that he declined to act, because record was unaccompanied by a petition. His official term expiring 31st December, 1882, record went into the hands of his successors. Record was endorsed, "appeal allowed" by one of those successors on 8th January, 1883, and was delivered to the clerk on the next day, and the bond was given on the 30th. It appears not when the petition was put in the record;

HELD:

> The time during which the first judge held the record must be excluded from the computation of the two years of limitation for appeals under Code 1873, chapter 178, section 17, as amended by chapter 42, page 30, Acts 1876-'7. The statute ceased to run on the endorsement by the first judge of his receipt of the record. This court hath jurisdiction of the appeal.

2. APPELLATE COURT—*Decisions final.*—Decree of such court upon *questions raised* by court below is final and irreversible. Upon second appeal, *questions decided* by the first cannot be reversed. Its decision is not only final as to the decree appealed from, but also as to all prior orders and decrees in the cause between the appellants and appellees. But this rule has, of course, no application where a different question arises, or the same question arises between different parties.

3. PARTNERS—*Compensation—Agreement.*—One partner is not entitled to compensation for his services while employed in the partnership business, unless it be so agreed between the parties. *Forrer* v. *Forrer*, 29 Gratt. 134.

4. PERSONAL REPRESENTATIVES—*Commissions.*—Administrator neglects to settle his accounts, and to file inventory, appraisement, and account of

sales, yet is allowed five per cent. commissions on receipts, amounting to $23,059.21 January 1st, 1855, and on $31,896.71 January 1st, 1854;

HELD:

> Such allowance is error, for which, standing alone, the decree allowing same would be reversed.

5. IDEM—*Investments in Confederate bonds.*—Administrator is responsible for the loss where, in 1863, without order of court, or of judge in vacation, under act of March 5th, 1863, he invested decedent's funds in Confederate bonds, especially where it appears that such funds might have been applied to pay debts of the estate, or divided among those thereto entitled.

6. IDEM—*Payment of debt to himself—Scaling.*—Where administrator, who is creditor of ·the estate, himself used in 1863 funds of decedent, and the amount so used was charged to him at its scaled value;

HELD:

> Claiming as creditor, his using the funds was payment of his own debt, and it was error to scale the amount.

7. IDEM—*Surviving partner—Advances—Commissions—Interest—Case at bar.*—Administrator, also surviving and managing partner of firm of himself, the decedent and another, out of the firm funds for a series of years, advanced large sums to himself as administrator. These annually went into the account of receipts, which exceeded the disbursements, and he received commissions thereon. · These sums also exceeded decedent's share of the profits of the business, and at the year's end, the excess was carried back into the firm accounts, and interest was charged on these over-payments.

HELD:

> Neither should commissions nor interest be allowed on such over-payments.

8. JUDICIAL SALES—*Setting aside sale after six months.*—Under Code 1873, chapter 174, section 11, forbidding such sale to be set aside when made more than six months after the date of the decree of sale, that period must be computed from the date of the decrees becoming operative, where "day of redemption" is given.

Appeal from decree of circuit court of Augusta county, entered November 30th, 1880, in the consolidated causes of James A. Frazier's guardian, against James A. ·Frazier, of Stephen A. Porter and wife against John W. Frazier's administrator, William Frazier, John T. Randolph, and others, and of Porter and wife and James A. Frazier against William Frazier, John T. Randolph and others.

The first suit was brought in February, 1854, in the circuit court of Bath county, by William Frazier and William M. Tate, guardians of James A. Frazier, only child of John W. Frazier, deceased, then about six years of age, and Elizabeth, the widow of said John W. Frazier, and afterwards the wife of Stephen A. Porter.

The object of this suit was to make sale of certain land belonging to the estate of John W. Frazier, deceased, situated in the county of Bath, and was what is called a "friendly suit," and was prosecuted in the said county until 1856, when it was removed to the circuit court of Augusta county. Such was the object of the suit, but by a vacation order entered 4th January, 1855, William Frazier was directed to settle his account as administrator of John W. Frazier, deceased. The account having been taken, stated and reported on the 25th April, 1855, the said widow filed exceptions to the report, and the litigation began, which was terminated in the circuit court by the decree of the 30th of November, 1880, from which James A. Frazier obtained from one of the judges of this court on 8th January, 1883, an appeal. The facts are fully stated in the opinion of the court.

*F. S. Blair*, and *Joseph Christian*, for the appellant.

*G. M. Cochran*, *William A. Anderson*, and *W. W. Gordon*, for the appellees.

LACY, J., delivered the opinion of the court.

The first question presented for the consideration of this court is the question raised by the appellees, the assignees of William Frazier, upon the two years limitation for appeals.

The appellees say that the final decree in this cause was rendered on the 30th day of November, 1880, and that the appeal allowed in this cause, by one of the judges of this court, was

allowed on the 8th day of January, 1883, two years and thirty-eight days after the final decree was entered, and the cause removed from the docket.

The appellant insists, on the other hand, that he presented the record for an appeal, duly copied and certified, to one of the judges of this court on the 5th day of November, 1881, who endorsed that fact on the record on the same day, and that by the law of this state the time between such endorsement and the time when the record is delivered to the clerk of the court of appeals, with the appeal allowed, shall not be computed in the two years of limitation for appeals; that such time so elapsing between the presentation of the record to a judge of the court of appeals, and the delivery of the same to the clerk, is saved to the appellant in every case by statute. This statute, which was passed at the session of the general assembly, 1876, 1877, is as follows:

"§ 17. No process shall issue upon any appeal, writ of error or *supersedeas* allowed to or from a final judgment, decree or order, if when the *record* is delivered to the clerk of the appellate court, there shall have elapsed two years, since the date of such final judgment, decree, or order; but the appeal, writ of error or *supersedeas* shall be dismissed whenever it appears that two years have elapsed since the said date, before the record is delivered to such clerk, or before such bond is given as is required to be given before the appeal, writ of error or *supersedeas* takes effect: provided, however, that section twenty-six of chapter one hundred and eighty-two of the Code of eighteen hundred and sixty, instead of this section, shall remain in full force and apply to cases in which the appeal, writ of error or *supersedeas* may be to any judgment or decree rendered before the passage of this act: and provided further, *that the time* which shall elapse from presenting the petition for an appeal, writ of error or *supersedeas, which shall be endorsed thereon by the judge* to whom the same shall be first delivered, and the delivery of the record to the clerk of the appellate court as

aforesaid, shall be excluded from the computation of the said period of two years."

The transcript of the record shows that on the 5th day of November, one of the judges of this court made thereon the following endorsement: "*This record was received by me the 5th November,* 1881. Waller R. Staples." And again, on the 24th of April, 1882, the following other endorsement: "I have taken no action on this record, because no petition accompanied the record. April 24th, 1882. W. R. S."

There is no other or further endorsement thereon until January 8th, 1883, when the appeal was allowed.

The appellant says that the statute of limitations ceased to run on the 5th of November, 1881, when Judge Staples made his first endorsement, and under the statute could not commence again to run until the record was presented to the clerk, and commenced again to run on that day, and stopped on the day the bond was given, which in this case was January 9th, 1883, the next day after the appeal was allowed.

The appellees insist that the statute was not stopped or stayed by the endorsement of the judge, because no petition accompanied the record when Judge Staples received it, and two years had run before the appeal was allowed on the 8th of January, 1883.

And this is the question thus submitted and first to be passed on by this court before the appeal can be considered on its merits.

It is useful here to enquire what is the object, purpose and scope of the provision of the law seen above, which provides "that the time which shall elapse from presenting the *petition for an appeal,* writ of error and *supersedeas*, which shall be endorsed thereon by the judge to whom the same shall be *first* delivered, and the delivery of the *record to the clerk* of the appellate court aforesaid, shall be excluded from the computation of two years." Does the law mean the petition alone shall be presented to the judge, without the record, and that the record shall be presented

to the clerk without the petition? or does it mean when the *petition and record* shall be presented to the judge, and when the *record and petition* shall be delivered to the clerk? The petition would be useless without the transcript of the record, and the law could not have been intended to mean the petition only, in the one case, nor the record other than the petition in the other case. When properly construed and duly considered, does not the law mean the *same thing exactly,* when, in this paragraph, it refers to the delivery to the judge, and then the delivery to the clerk? *What is, in fact, the difference between what is delivered to the* judge *and what is delivered to the clerk in all cases of appeal?* The same thing which is delivered to the judge is delivered to the clerk, with an endorsement thereon, and that endorsement is not the petition nor is it the record. But the law, when speaking of this thing with reference to the judge, says petition, and when speaking of the clerk, says record; and yet it is the same thing precisely in both cases. It is the record in the case—the transcript of the record of the proceedings in the lower court and the petition, known in this court as the record, and so called in all the proceedings in this court.

If the two words signify the same thing in the law, what is the difficulty in this question? What did Judge Staples mean when he endorsed this record? he was an experienced judge, he had the power to grant the appeal, but he did not have the power to refuse it; that could be done only by the whole court. He had the power, by placing that endorsement on the record, to stop the running of the statute. If such was not his purpose, what did he put that endorsement there for? Of course he had some purpose. If it was not to certify the fact that this case was in the court of appeals and in the hands of one of the judges for an appeal, what could it have been for? And if he certified that the case was in his hands for an appeal, what course after that was it obliged to take? Judge Staples could

grant the appeal and deliver the record to the clerk, or he could have endorsed his refusal of the appeal and delivered the record to one of the other judges. He did neither, so far as the record discloses. But, on the 24th of April, 1882, five months and nineteen days after he received it, he endorsed on it, as we have seen, "I have taken no action on this record, because no petition *accompanied* the record."

What did he mean by this endorsement? There was no authority in the statute for this endorsement. If he meant to refuse the appeal, did he deliver the record to some other judge? the record does not disclose. Can we suppose that Judge Staples kept that record in his hands five months and nineteen days without knowing that the petition was not there. Then why did he hold it? He could have had but one motive in endorsing the record to hand, and then holding it for five months and nineteen days, and in the absence of all evidence in the record as to what he did with it, we are left to infer that he continued to hold it until his term expired December 31st, 1882, when it passed out of his hands to his successors in office. And if he did not keep it himself, so far as the record discloses, it may have been in the hands of one of the other judges then in office; but, beyond all question, the record shows that he had it in his hands on the 24th of April, 1882, whatever he did with it after that. Now, we think that it is clear that the time when he held it must be excluded from the computation of the two years. He evidently considered that he was holding it under the statute, and had stopped the statute from running, and he no doubt so informed the appellant; and during that time he was one of the judges of this court, and his acts are entitled to exactly the same respect and deference as we would accord to the acts of any judge of the present court. And so far as his acts go in this regard he was performing a function of the court of appeals, which one judge is authorized to do as and for the whole court. One judge may award an appeal, and it is the act of the court; one judge is authorized to endorse the record to hand, and it is bind-

ing on the whole court, is the act of the whole court, and we must say, therefore, that this endorsement of the judge of this court is conclusive under the statute. And we may observe that while the experienced judge of this court so construed the effect of his act—the equally experienced clerk of this court, who received all the appeals in this court and had done so for years, and who was forbidden by the statute to issue any process if the two years had expired, endorsed on the writ issued in this cause that the time was saved from the endorsement of Judge Staples; and we are of opinion that the statute ceased to run upon the endorsement by the judge of the receipt of the record. We may add, that if we held a different view, there is no evidence when the petition was actually put in the record.

We are therefore of opinion to deny the motion to dismiss for want of jurisdiction.

The next question presented to this court in this cause, is a motion to dismiss the appeal as improvidently allowed for the following reasons : "A careful examination of the record, when made complete, will show that the decree entered April 7th, 1877, decided all the principles in the cause as between James A. Frazier and William Frazier, and finally disposed of all matters of controversy between those parties. All that was left to be done was a mere matter of computation."

On the 18th of June, 1877, another interlocutory decree was rendered in these causes in favor of James Campbell's administrator, from which the appellant here took an appeal to this court. (See transcript of record of *James A. Frazier* v. *James Campbell's administrator*, among the records of this court.) That appeal was finally passed upon by this court at the September term, 1877. It is claimed that it was an interlocutory decree, but it brought up the whole record to the date of that decree, and that while nothing involved in that appeal between James A. Frazier and his guardian, and James A. Frazier against William Frazier as surviving partner of his

father, and James A. Frazier against William Frazier, as administrator of his father, but was a controversy between James A. Frazier and Campbell's administrator, concerning the title to a parcel of land bought by John W. Frazier of Campbell, and from which he was evicted, and in which James A. Frazier and William Frazier had a common interest; that it cured all errors between the two Fraziers, because this court passed on the errors between the two Fraziers, and another person about a distinct subject. This court said in the case of *Campbell* v. *Campbell*, cited to sustain the motion, that *an appeal* from a decree brings up the whole proceedings in the case prior to the decree, and either party can have any error against him in those proceedings corrected without the necessity of a cross appeal in any case. This is very true, and is often acted on, and is never disputed. Indeed, a rule of this court provides that, in any appeal, writ of error, or *supersedeas,* if error is perceived against any *appellee* or defendant, the court will consider the whole record as before them, and will reverse the proceedings, either in whole or in part, in the same manner they would do were the appellee or defendant to bring the same before them either by appeal, writ of error or *supersedeas,* unless such error be waived by the appellee or defendant; which waiver shall be considered as a release of errors as to him. And this is what Judge Moncure, speaking for the court, meant in the language cited above; and this is all he meant, as is shown by the preceding paragraph: "The decision of this court is not only final in regard to the decree appealed from, but also in regard to all the prior orders and decrees in the case *between the* APPELLANTS and THE APPELLEES."

The decree of the court of appeals upon *a question* decided by the court below is final and irreversible: and upon a second appeal in the cause, *the question* decided upon the first cannot be reversed. In that case the court says: "The main, though not the only question arising in this cause is, whether the decree pronounced by this court, 28th of August, 1856, declaring,

&c., is, or is not, a final and conclusive decision of the question of such validity in this case; or, in other words, whether this court can now reverse or alter that decision—to wit: in 1872. To state the question is to answer it."

Again, in *White* v. *Atkinson*, 2 Call, 376, decided in 1800, it was held that a court of chancery cannot make any alteration in the terms of a decree of this court, certified thither, in order that a final decree may be made in the cause.

In *Price* v. *Campbell*, 5 Call, 115, decided in 1804, the same doctrine was held. Tucker, Judge, said: "The single question is, whether the chancellor could, upon the same facts, change a decree of this court. *White* and *Atkinson* decides that he could not, and I approve of that decision."

In *The Bank of Virginia* v. *Craig*, 6 Leigh, 399, it was held that this court cannot examine the propriety of a decree made at a former term *inter partes.*

In the case cited above of *Campbell* v. *Campbell*, Judge Moncure said: "According to the authorities before referred to, we think it very clear that we have now no right to review and reverse the decree pronounced by our predecessors in this cause on the 28th of August, 1858."

These principles are all well settled, and are not now disputed. This controversy is not the same controversy, it is not the same question, it is not between the same parties, it is not the same decision *inter partes.* It is not a question between the same appellants and appellees, as the case of *Frazier* v. *Campbell*. That case has been decided by this court, and it is not now sought to be disturbed. However erroneous that case may be, under the authorities cited above, it is intrenched beyond assault; its position is impregnable. It was never reported, and we do not know the details of the decision, except that it has been stated at bar that its decision was adverse to the appellant therein, the appellant in this case. We have, however, made a careful examination of the record in that case, in order to determine its bearing on this, and we find that it was a controversy

over a tract of land of one hundred and three acres sold by
Campbell to Frazier, and the title failing, upon the question of
compensation it was valued by the report of the master March
15th, 1876, at $1,500 upon evidence.    This report was set aside,
and it was referred to another commissioner to take further tes-
timony and value the land.    This other commissioner reported
the land worth $1,500.    This was set aside also, and the alter-
nate statement valuing the same at $1,000 was also set aside,
and it was again referred to witnesses, this time to witnesses
selected by adverse counsel in effect, and it was valued at
$412.    And again three witnesses were selected.    They valued
the land at $103—and *this* the court confirmed—and said they
" were *peculiarly well qualified* to judge of the value of that
tract; and John D. Sterrett, the third commissioner, being a man
of *recognized intelligence and integrity,* and also well acquainted
with the value of such land, in the judgment of the court, *great
weight* was due to their opinions and report;" and this decree
this court affirmed against James A. Frazier in 1877, but the
case was never reported to illustrate the principles which it set-
tled.    But while this case, just above referred to, binds James
A. Frazier for all time to come, so far as the question therein de-
cided is concerned, it has no connection and no concern with
the case now in hand, and cannot be appealed to by William
Frazier, nor his assignees, to protect them against a review of the
transactions of William Frazier, as administrator of John W.
Frazier, deceased, and against a review of his dealings and
transactions as surviving and managing partner of the Rock-
bridge Alum Springs.

James A. Frazier is entitled to have the decrees in this cause
reviewed on their merits, and the motion to dismiss the appeal
upon *this ground,* as improvidently awarded, is also overruled.

We will consider the case now upon the assignments of error
herein.

We have already stated that upon the coming in of the first
commissioner's report exceptions were taken in 1855.

John W. Frazier having died April 9th, 1853, William Frazier and one William M. Tate qualified in August of that year as administrators of J. W. Frazier and guardian of James A. Frazier, the infant child. The suit mentioned above as brought in 1854, was for the sale of lands of the said John W. Frazier. In that suit by order therein of 1855, William Frazier's administration accounts were ordered to be settled, and upon the settlement five per cent. commissions were allowed the administrator upon his receipts of $23,059.21, making the sum of $1,152.96. This is assigned as error—the accounts of the said administrator not having been settled within the time prescribed by law, that his commissions were forfeited. This report made the estate of John W. Frazier owe William Frazier the balance of $36,203.85.

The balance January 1st, 1854, had been $42,305.96; five per cent. commission was allowed on the receipts for that year, to-wit: $31,896.71, making $1,594.83 which went of course to swell the balance stated above, and then interest for the year to come, to-wit: to January 1st, 1855, was added, and made the balance for that year $44,844.32, which is also assigned as error.

The exceptions to this report are, first, because the settlement of the administrator's accounts was in no way involved in the pleadings, and had been made by indirection to save commissions already forfeited under the law. Secondly, because the administrator had settled *without* vouchers, had filed no inventory or appraisement, or account of sales; no list of bonds or debts due the intestate is found with the report; no administrator's bond filed with the commissioner to enable him to report on its sufficiency in amount of its penalty, or soundness of its security.

That bonds, due and to fall due the intestate, on William Frazier, to the amount of $48,000, and on John T. Randolph for $48,000, and other bonds and notes to the amount of $17,000, due the estate at the death of the intestate, and slaves to the amount of $22,000, came also into their hands; a store, stock and

accounts to the amount of $8,000, besides the interest of the intestate in the estate of his father, amounting to $4,000, and his one-half of the personal property at the Rockbridge Alum Springs, besides the large annual profits at the Rockbridge Alum Springs, and yet, though three years have elapsed since the administration, no account had been settled to give the court even a hint of these important matters, nor do they appear any where *by any exposé made by the administrator;* that the administrators, with the knowledge of the large amount of the assets belonging to the estate and to come to their hands, executed their administration bond in the absurdly inadequate penalty of forty thousand dollars; that the estate is charged with $1,561.50, as received by John W. Frazier, without a voucher, and is not true in fact. Because the administrator is credited with large sums of money, paid off by him for the estate, when in fact they were not paid, but replaced by notes of the administrator as administrator, and left the estate still bound; because the estate of John W. Frazier was charged with large amounts not due by him, but by the partnership of Frazier, Randolph & Frazier, for furnishing the Rockbridge Alum Springs in the fall, winter and spring of 1852–'53; and to a charge of commission on $9,000 due by the administrator to the estate, being his own debt; that the amount of $29,216.42$\frac{1}{2}$ was charged to John W. Frazier, contracted for supplies from November, 1852, to April, 1853, and were incurred in furnishing the Rockbridge Alum Springs, and is a charge on the partnership concern of Frazier, Randolph & Frazier; that during that period John W. Frazier was engaged in no other business; and that during all the years that had elapsed, the said William Frazier had made no settlement of the partnership accounts. Upon these exceptions the court recommitted the account, as was done again and again to many different commissioners. The details of which litigation cannot be followed out in this opinion, nor is deemed necessary.

The facts appear, in brief, to be that John W. Frazier de-

parted this life, intestate, on the 9th day of April, 1853, seized
of a large estate in the counties of Bath, Rockbridge and Au-
gusta.    Many years before his decease, he had purchased the
Cloverdale estate, consisting of several large and valuable tracts
of land, including the Cloverdale Hotel, and had made thereto
large additions; so that he was possessed of six thousand acres
there.    In 1848 he purchased the Bath Alum Springs property,
leased his Cloverdale estate, and moved to the said Springs in
1850; and also owned and kept a large store at Fairview, in
Bath county.    In August, 1852, he purchased the Rockbridge
Alum Springs property for $150,000, on a credit running to
the year 1859 for the last payments.    Soon after his purchase,
he sold one-fourth of the last-mentioned property to William
Frazier, his brother, for $55,000, and one-fourth, in like manner,
to John T. Randolph, for $55,000, which included a like in-
terest in the Bath Alum Springs property; by which sale John
W. Frazier secured to himself $110,000 of the purchase money
for the Rockbridge Alum Springs, leaving $40,000 to be
paid by him out his own estate, and the payments of William
Frazier and John T. Randolph were made to correspond with
the time of his own payments.    The said Rockbridge Alum
Springs and Bath Alum Springs were to be occupied after Janu-
ary 1, 1853, by the partnership concern of Frazier, Randolph &
Frazier, of which John W. Frazier was the managing partner,
by the consent and solicitation of his partners.    John W. Fra-
zier paid $12,000 of his debt on the Rockbridge Alum Springs
property in January, 1853, before his death.    William Frazier
and Randolph had paid $7,000 each before the death of said
John W. Frazier, so that William Frazier and Randolph owed
John W. Frazier at his death $96,000, and their half of the
expenditures on the Rockbridge Alum Springs property, making
about $15,000.    In addition, the personal assets are stated at
$17,000 in solvent bonds, slaves to the amount of $28,000, his
store at Fairview $7,000, his half of the equipment of the two
watering places, at $25,000, his interest in his father's estate

$4,000, besides accrued hires of slaves, and rents due on the Cloverdale lands, exceeding an estimate of $177,000 for the personalty of the estate, on which the *brother* and *brother-in-law* of the dead man qualified with a bond of $40,000.

At the August term, 1853, these same gentlemen qualified as guardian of the infant James A., without the consent and knowledge of the mother, and in the penalty of $20,000, by which qualifications they estimated the personalty to be $20,000, and the estate of the ward to be during the fourteen years of his minority, $10,000. And from this position as guardian he was at last retired by the order of court, which required a new bond in the penalty of $75,000. The various parcels of real estate were sold, other than the two Alum Springs property under various proceedings in this cause, for large sums of money, and finally in the midst of the uncertainties of the period of the war, a sale was effected by decree of court of the Bath Alum Springs property for $30,000 in Confederate money, which was a total loss to the parties. The history of this transaction can be found in the case of *Frazier* v. *Frazier,* reported in 26th Gratt., where the sale was finally sustained by this court by decree therein entered.

The Rockbridge Alum Springs property now remained, and William Frazier as managing and surviving partner, took possession of and conducted these springs as surviving and managing partner, and the record shows that they were very valuable, the net receipts being stated at $10,000 per annum. There were frequent references to a commissioner to take an account of these transactions as managing and surviving partner in the year 1860; and upon exceptions, the account was again recommitted, in the year 1866, the court passing upon none of the exceptions. In January, 1868, additional exceptions were filed.

The controversy during this period was a struggle between the parties to obtain control in the management of the Rockbridge Alum Springs property; the other parties in interest failing in their efforts to remove William Frazier, although they

held three-fourths of the interests, and William Frazier held only one-fourth, endeavored to have themselves admitted into some participation in the management of the property, or, at least, to have an agent to represent them and to protect their interests *on the ground,* but the managing partner resisted *successfully* all these efforts of the parties either to obtain a foothold for themselves or their agent. The commissioner in the settlement of the partnership transactions of William Frazier allowed to the said managing partner a salary for each year in a large sum, in many years a salary of $2,250 per year; this was earnestly resisted by the other parties in interest upon the ground that there was no agreement between the parties to pay a salary to the surviving and managing partner, but that on the contrary he had agreed expressly to make no charge for his services; and this the surviving partner substantially admits, but, if not admitted, it is abundantly proved by the evidence in the cause. The other parties in interest charge and prove that while the managing partner was holding the springs, he maintained at the common cost and charge himself and a family of ten persons, with servants and horses, and teachers for his children, having at times both male and female teachers; and for the years, from 1853 to 1868, a period of fifteen years, the other parties claim that, at the most moderate rates, the costs to them was, at the least, some $30,000. And they insist that such support and maintainance for so many years, at the common cost, was a sufficient compensation without the addition of allowance for salary, to aggregate close upon another $30,000. The circuit court disallowed the salary for the years 1853, 1854, but allowed it for all the remaining years, assigning for reason, that William Frazier did not expect to be allowed a salary for those two years. It would seem equally logical to have disallowed the salary for all the subsequent years, because the other parties did not expect to pay a salary.

Finding it impossible to dislodge this surviving and managing partner, or to be admitted to any share in the control of the

concern, and seeing what seemed to them a complete dedication of the whole subject to the uses and benefit of one partner, and he only a one-fourth owner, they filed their petition for a lease of the property. This only led to fresh litigation, and a new commissioner's report, which came in March 29th, 1868, with a commissioner's fee-bill of $701. Exceptions were filed to this report June 8th, 1868, and interrogatories were filed June 9th, 1868, to William Frazier as to his family and the number of tutors, &c., supported by him at the springs at the common cost, to which he replied only after a second and peremptory order. On the 30th of June, 1868, a decree was entered consolidating the three causes named above, passing upon some of the exceptions, and appointing commissioners to sell the springs, William Frazier having declined joint management, and resisted a lease, and recommitting the cause to the commissioner again. The commissioner's third report came in July 10th, 1868. On the 15th of September the commissioners appointed to make sale made their report—that they had made sale of the property on the first day of September, 1868, at the price of $236,000, to James A. Frazier—that the terms had been complied with—that they thought the sale adequate, and recommended a confirmation. On the 4th day of November, 1868, this sale was confirmed by the court; and on the 23d day of November, 1868, a decree was entered, which re-committed the cause to Commissioner Hendren, with instructions to take and settle the accounts of William Frazier as surviving and managing partner of the Alum Springs copartnership, and of William Frazier, administrator of the estate of John W. Frazier, deceased, which had accrued since last settlement, and on the 9th of June, 1870, this commissioner made his report. In July, 1870, James A. Frazier filed a petition for a rehearing, asking the court to disallow the salary heretofore allowed William Frazier, and for other relief.

· The circuit court on the 27th day of January, 1877, by decree entered therein, refused to rehear the cause, and allowed the

salary, except as to the years 1853–54, but disallowed the salary for these two years because he did not regard himself as laboring for a salary, and referred the cause to a commissioner to strike out the salary for those years, and the cause is this time referred to another commissioner, who was directed to report the amount of purchase money still due from the purchaser, James A. Frazier, and how much had been paid, and how? To whom the balance of the purchase money due from James A. Frazier belongs? How much to each of his co-tenants, and how much belongs to Stephen A. Porter, deceased? Whether there have been any assignments made by William Frazier and John T. Randolph, of their interest, and if so, to whom made?

This report came in June 1st, 1877, after adjusting the respective interests upon the basis of former decrees.

The court, on the 13th of November, 1879, decreed that unless James A. Frazier pays the amount there found due, within sixty days, commissioners named therein are to make sale of the Springs.

On the 19th of June, 1880, sale was made to C. R. Mason, at $134,000, and reported to court July, 1880, and approved by the court; and, as shown by the report of a special receiver, the said purchase money was about sufficient to pay off the liabilities hereinbefore referred to. And on the 30th of November following the cause was ordered to be removed from the docket as ended.

Upon the appeal here, the first assignment of error to be passed upon by this court is the allowance of an annual salary to the surviving partner, William Frazier, under the circumstances of this case. This is a question which has been most elaborately argued on both sides; but which appears to the court to be well settled by the decisions of this court.

In the case of *Forrer* v. *Forrer*, in 29 Gratt. 134, Staples, J., speaking for the whole court, said: "No rule of law is better settled than that one partner is not entitled to compensation for his services while employed in the partnership business, unless

it be so agreed between the parties. The doctrine is thus laid down by a writer of acknowledged merit: 'As it is the duty of each partner to devote himself to the interests of the concern, to exercise due diligence and skill for the promotion of the common benefit, it follows that he must do it without any reward or compensation, unless there is an express stipulation to that effect. And there is no difference in this respect, though the duties performed by the partners have been very unequal in value and amount.'" Collyer on Partnership, section 183. See also Strong on Partnership, section 182; Parsons on Partnership, page 130.

In *Franklin* v. *Robinson,* 1 Johnson Chancery Report, Chancellor Kent said he knew of no case which entitles one partner to charge for his services, except upon the ground of special agreement. In another case it appeared that one of the partners had taken the almost entire and exclusive charge and superintendence of the business of the firm, and yet it was held that his claim for compensation could not be allowed. *Phillips* v. *Turner,* 2 Dev. & Battle Eq. R.; *Patton's ex'or* v. *Calhoun's ex'ors,* 4 Gratt. 138.

The reason for this rule is, each partner in taking care of the joint property, is, in fact, taking care of his own interest, and is but performing his own duties and obligations growing out of the partnership. These duties and obligations are supposed to enter into and constitute a part of the consideration for others to engage in the business with him. The partners are considered as meeting on a common ground, each engaging to do all that he can do for the common good.

In the second place, the law cannot undertake to measure and settle between the partners the relative value of their various and unequal services bestowed on the common business, and for the obvious reason it is impossible to see how far the relative experience, skill, ability, or even known character and reputation of each entered as ingredients in the adjustment of the terms of the partnership. If a partner is unwilling to perform

any very unequal service without reward, he ought to stipulate that it be allowed him. In the absence of such stipulation, it must be presumed he is willing to render the service without remuneration. Parties assuming this relation are presumed to know the law, and to intend to be governed by it, unless they agree to be bound by some other rule. It is a mere question of degree. So soon as the courts undertake, upon a mere estimate of a partner's services, to award compensation in one case, they must do so in all cases where the skill, labor and diligence are unequally bestowed. This would be simply to abolish the rule of law, and to place the right to compensation not upon contract, but upon the principle of *quantum meruit.* It will be found, upon examination, that the doctrine of nearly all the cases is, that compensation can only be allowed where there is an *express* agreement to that effect, or one necessarily to be implied from the conduct of the parties.

When these principles are applied to the case in hand, what do we find? William Frazier not only did not make any agreement with the parties that he was to have a salary as managing partner, but by words and acts expressly negatived the idea. When the other partners urged the propriety, the necessity, and their wish to employ a person to represent them in the management, he violently objected, and said it was a saving for him to be there, as he cost the concern nothing, and another person would have to be paid. When one of the copartners was with him in the management he caused him to leave, said he didn't suit the business, was objectionable to guests, or words of like import, and found the presence of the widow of the deceased partner disagreeable, and brought about her departure, saying he would brook no divided responsibilities, that there must be one head, &c. How then could he ask and receive at the hands of the circuit court a large salary of $2,250 per year for attending to this business by himself when he would not suffer any of his copartners to take any part of the control or management? How, it may be asked, did he

manage to obtain such an allowance from the court in the very face of the law, in defiance of its plainest provisions; that he was *able* to clear the place of everybody but himself is a matter of some surprise, but how he managed in a court of justice to *keep them off* and repel all interference for so many years, is altogether incomprehensible; and that in the face of the exhibit made by this record he obtained so large a salary for so many years, and moreover, obtained from the court and commissioner so large a commission, is unexplained.

But if in ordinary cases a salary could be allowed a surviving and managing partner, the circumstances of this case would altogether preclude such an allowance. If this managing partner had his family of ten persons, servants, tutors, horses, &c., maintained all these years, how much salary ought a court of equity to allow such a person? The counsel who argued this case for the appellant, estimated the cost of supporting his domestic establishment at $30,000 for these fifteen years. Surely it was most inequitable to add a large salary of $2,250 upon that. The circuit court at one time seemed to be somewhat impressed with the hardships of that salary, and did actually deny the salary for two years, as we have seen, but then let it stand for the remaining years. All this is plainly wrong and in violation of the well settled rule of law upon the subject, and is held to be erroneous, and must be reversed and annulled.

The allowance to the administrator of commissions at five per cent. on $23,059.21, January 1st, 1855, and the allowance of five per cent. on $31,896.71, January 1st, 1854, when the administrator had utterly neglected to settled his accounts, to file an inventory, and appraisement, and an account of sales, within the time required by law, is erroneous.

In *Turner* v. *Turner*, 1 Gratt., this court said: " The court is of opinion that the claim of the appellee, as administrator of the said Benjamin James, to commission or compensation for his services in administering the estate of his intestate, was forfeited by his failure to comply with the provisions of the act, and

failure to settle his account, and for *this error the decree is reversed."*

In *Morriss* v. *Morriss,* 4 Gratt. 293, it was held that an administrator, having failed to settle his accounts, was not entitled to commissions. But it is entirely unnecessary to cite authority upon this point. It is a plain statutory provision, and the cases are cited only to show that it was error for which, *when standing alone,* this court would reverse a cause.

On the 17th of July, 1863, the administrator invested the funds belonging to the estate of his decedent in Confederate bonds to the amount of $20,000—$2,000 in Confederate seven per cent. bonds, and $18,000 in Confederate cotton bonds, which were a total loss to the estate. This was approved by the circuit court. This investment was not made by the order of any court of competent jurisdiction, nor by order of any judge in vacation under the act of March 3d, 1863. It was upon the administrator's own motion, and appears to have been, under the circumstances of this case, injudicious and ill advised. It does not appear that the money could not be used to pay debts of the estate, nor of the partnership, both of which owed debts, and, indeed, the record shows that after that time money of the same kind and more depreciated was actually used to in part pay the debts, and there is no attempt made to show that no use could have been made of it; and it appears on the other hand that it could have been divided among the parties, who were in much need. If this sort of money could be used to pay the debts as late as the 26th of September, 1864, which was done, the burden devolves on the administrator to show that such use could not have been made of the same sort of money July 17th, 1863; and if this fiduciary, without the authority of any court or judge, took upon himself the responsibility of making this investment in plain violation of the law, he must be held responsible to the estate for the money so used by himself, and cannot be allowed to throw the loss upon the estate of his intestate. No court would have sanctioned such an investment at

the time it was made, and no court ought to sanction it now, and the circuit court erred in so decreeing.

On the 31st day of October, 1863, the administrator himself used $2,500. Why was not this a payment to himself? But by decree of the court below it was scaled long afterwards to $200. This was erroneous. He claimed to be a creditor. It was as much a payment to himself as it would have been to any other person.

Upon the second assignment of error in the petition, it is charged that the administrator was allowed by the commissioner's report a commission upon $47,000 due by himself to his intestate's estate, that the circuit court overruled the commissioner upon this point, but that by indirection the same result had been brought about by the system of advancements which prevails throughout the account from the partnership funds. It has been difficult to understand why the managing partner should so persistently advance to himself large sums of money from the partnership funds, and thus swell the enormous balances of collections or receipts each year over and beyond all disbursements, and appearing so unnecessary, and at a casual observation apparently without reason or profit to himself or to any other person; but upon a close scrutiny of the question it seems that a profit might thus be made by this administrator in that way if the charge should be so made. Thus the administrator advances so much to himself as administrator from himself as managing partner, thus swells the balance due to himself *individually* at the end of the year as against his intestate's estate, and receives his commissions and interest accordingly, as is repeatedly done in this case throughout the administrator's account. Then, to get this amount back in December, 1854, for illustration, it is entered thus: *Overpaid*, J. W. Frazier's estate, $5,373.66.

"Wm. Frazier, managing partner, in account with J. T. Randolph, to his dividend, $2,399.82." And then it is thus stated :

"Now, Randolph, being the debtor of J. W. Frazier's estate on account of his purchase of the one-fourth of the Rockbridge Alum and Bath Alum properties, let him receive credit with said estate for a sum equal to the above stated balance. In consideration of which credit, let J. W. Frazier's estate be regarded as the owner of the said balance. Then let William Frazier, as administrator of J. W. Frazier, *receive credit* by the difference between his over-payment, as managing partner, to J. W. Frazier's estate, and said Randolph's balance—that is, for the sum of $5,373.66, less $2,399.82—that is for $2,973.84—and thus will this year's partnership be closed." December 31st, 1855, the next year, this operation is repeated—as, to overpaid J. W. Frazier's estate, $8,863.62. The year before it was $875.90; in the year 1856 the amount over paid is $8,504.20; in the year 1857, $9,784.09; December, 1858, it is $6,413.76; December 31, 1859, $9,798.25; December 31, 1860, $3,189.27; December 31, 1861, $1,004.23; December 31, 1862, $7,358.22; December 31, 1863, $336.25; December 31, 1864, $447.87; December 31, 1865, $253.75; December 31, 1866, $2,414.15; December 31, 1867, $1,253.62—aggregating the sum of $65,870.84, which came out of the partnership funds nominally into the administration account to rest long enough to be stated there and pay their *due commissions,* and then return as they came, except thus depleted, into the partnership fund again. Five per cent. on this sum would be $3,293.54, which has been a loss to the estate by mere manipulation, and which worked ruin to the estate of John W. Frazier in the matter of interest. The large balances obtained each year, in part by these methods, carried in this account interest, as we have seen *supra,* and each year fell into the column of principal, and have permeated the whole account with this vice.

Counsel say the interest was paid each year, and there was thus no place for it—so it appears each year by this account—but if it had not been paid, what was used to pay it would have been there, and would have easily changed the face of this ac-

count; and we have seen the questionable methods by which it was obtained; the curious might make the calculation, and it would illustrate the fact that "interest is a devouring element;" but for the purposes of this case, it cannot be reached or remedied, and must remain as many others, an intrenched and uncorrected error. But this surviving partner was not yet done with himself as administrator of John W. Frazier, deceased, on this subject. So in 1867 we find a statement of what is called interest liabilities from 1854 to the year 1867, inclusive, excluding 1861, in which interest is again computed on these balances and added together as a charge on the estate.

In 1853, the balance is regarded as so small as not to be mentioned, but in 1854 it is stated as $200, which is not the interest on the whole amount of the sum overpaid, which was $5,373.66, nor is it the interest at the legal rate on the balance after deducting the amount due from J. T. Randolph, which was $2,399.82, but is a fancy sketch by the commissioner, thus:

" For the year ending 1st of January, 1855 (the year 1854), his estate may be fairly held to account on the score of interest on withdrawals over and above contributions for the sum of $200." It would seem, from what has gone before, that that sum had been before sufficiently taxed with commissions and interest indirectly without this direct attack; but for the year 1855 we have, in like manner, $370; for 1856, $375; 1857, $345; 1858, $260; 1859, $280; for 1860, $125; 1861, ——; 1862, $320; 1863, $41; 1864, $29; 1865, $15; 1866, $62; 1867, $83. And the commissioner naively observes that he regards the above "as the fair interest liabilities of the partners *inter sese*" for these years. It cannot be contended successfully that this fanciful and arbitrary dealing with a dead man's estate, had in accordance with no rule of law, and no precedent, and no authority save what the commissioner is pleased to say he considers may be held as fairly chargeable on the estate, ought not to receive the sanction of any court of justice; and taken in connection with this unsup-

ported charge of interest against John W. Frazier's estate, we will observe the commissioner's statement thus :

"As to William Frazier, the same may be said as in the case of Randolph, and in addition thereto it may be remarked that, he having been all the while the managing and working partner, even had he withdrawn and appropriated to his own use *much more largely* of the partnership funds than he appears to have done, such withdrawals should fairly have been considered as but so much on account of a *well-deserved compensation,* and that as to them he should have been held *exonerated* from *interest liability."* It seems that there was well nigh no end to the compensation of this much compensated surviving and managing partner. We have said enough to show the manner in which this estate was really wasted and ruined, and the way was thus cleared for the statement of Commissioner Smith that the estate of John W. Frazier was an insolvent estate, which, under this system, was, in fact, utterly wrecked, and the evil day only postponed by the purchase made by the heir, upon coming of age, of the springs property bought by his father at $150,000, and bought by him at $236,000, and to which point he was followed by the administrator in a spirited contest before the auctioneer; and which the heir, at no very distant day, was destined to discover when staggering under the load of debt thus incurred, he saw this same property knocked down at $134,000, which was just sufficient to pay the amount of debts due on it by him; chief among which was the debt due his father's administrator, created by the methods herein before considered. The purchase by the heir was his own act, and though the purchase was made by him under a mistaken apprehension of facts, caused by the errors of the court below against him, at this late day, when so many transactions have intervened, and so many rights vested, it would not now be proper for this court to set that sale aside. It would be practically impossible to restore the parties to their true position. But this does not apply

to the second sale or to the proceeds of that sale. It is
contended that the said sale was made six months after the
decree directing the sale, and that under the sale the pur-
chaser is entitled to hold his purchase by virtue of the
statute in that case provided. It is not necessary to pass
upon that question in the view we take of this case; but
the facts are that the decree did not become operative until
sixty days after it was entered, and the sale was made
*within* six months after the expiration of the sixty days; but
under the circumstances of this case, the long litigation herein
which has run for nearly thirty years, it is right to put here an
end to this litigation, and this court will not remand this cause
for correction of errors, but having the whole subject before
it and all the evidence in the cause, will enter here such a de-
cree as will correct the errors below as far as possible, by
allowing the sale to stand and decreeing the payment of the
money in accordance with the rights of the parties, and
setting aside so much of the decree which distributes the
purchase money, and entering here the decree which the circuit
court ought to have entered; so much of the decrees herein as
allows a salary to William Frazier, as surviving and man-
aging partner, is set aside and annulled; so much of all the
decrees as allowed William Frazier commissions for the years
1853 and 1854, when he had not settled his accounts; so much
of all decrees as allows William Frazier credit for money im-
properly vested in Confederate bonds; so much as charged John
W. Frazier's estate with interest on the so-called advancements
from the partnership funds, and so much as allows William
Frazier commissions on these advancements; and all of the un-
supported table of interest liabilities made up upon the same
sums as interest liabilities from 1853 to 1867, inclusive, except
the year 1861, are set aside and annulled. And these sums will
be charged upon the interest of William Frazier in the fund
in the hands of his assignees. This sum will be decreed to

James A. Frazier against the said assignees, and against the
purchasers of the Rockbridge Alum Springs, and decreed to be
a charge upon the said Rockbridge Alum Springs property in
the hands of the said purchasers, second in dignity to the
Campbell debt only, and of equal dignity with the debt due
John T. Randolph.

James A. Frazier is entitled to recover of William Frazier,
on account of salary erroneously allowed said William Frazier
by the circuit court, for his one-half principal and interest,
$27,412.50; on account of commissions erroneously allowed for
the year 1853, principal and interest, $5,726.27; on account of
commissions erroneously allowed for the year 1854, principal
and interest, $4,572.69; on account of interest liabilities errone-
ously charged, principal and interest, $6,321.00; on account of
Confederate money paid to self, and scaled improperly, his half
principal and interest, less $100, the amount allowed, $2,950;
on account of Confederate investments improperly made and
erroneously allowed, his one-half principal and interest, $13,000;
commissions on advances improperly made, as surviving partner,
to the estate of John W. Frazier at five per cent., a sum aggre-
gating $3,293.54 of principal, with interest on the several
amounts from the first day of January in each year from 1855
to 1867, inclusive, and to a like credit for interest allowed on
each item in each year; which several amounts aggregate a sum
largely in excess of $57,629.41, as of October 1st, 1880; which
is, under the circumstances, the only sum available for the cor-
rection of errors against the said James A. Frazier. It is,
therefore, not necessary to further sum up the amount of the
sums to which the said James A. Frazier is entitled. And that
sum of $57,629.41 will be decreed to the said James A. Frazier,
and held to be a lien on the Rockbridge Alum Springs property.

For the foregoing reasons the said decrees of the circuit court
must be reversed and annulled in so far as they are in conflict
with this opinion.

Decree.

HINTON, J., dissented on the question of jurisdiction, and took no further part in the decision.

The other judges concurred in the opinion of LACY, J.

The decree is as follows:

This day came again the parties by their counsel, and the court having maturely considered the transcript of the record of the decrees aforesaid and the arguments of counsel, is of opinion, for reasons stated in writing and filed with the record, that the circuit court erred in the decree entered in the consolidated causes of *Porter and Wife and others* v. *William Frazier and others,* and the same and *James A. Frazier* v. *William Frazier and others,* and *Frazier, guardian,* v. *Frazier and others,* on the 30th day of November, 1880, in so far as it approved and confirmed the report of Special Commissioner John Echols, appointed by the decree entered in these causes on the 3rd day of July, 1880, to convey the Rockbridge Alum Springs property in the proceedings mentioned to C. R. Mason, or such person or corporation as said C. R. Mason should, in writing, request, and in so much as directed to be delivered to the Rockbridge Alum Springs Company the deed of the said special commissioner and the said C. R. Mason, conveying the Rockbridge Alum Springs property, including the Ailstock and Dunlap tracts, and in so much as directed the said commissioner to deliver to the said Rockbridge Alum Springs Company, or its agent, the deed from James Campbell's heirs to James A. Frazier, mentioned therein, and so much of the said decree, as is erroneous as aforesaid, is set aside, reversed and annulled. And so much of the decree entered in the said causes July 3rd, 1880, as confirms the sale made by Special Commissioners John Echols, Hugh W. Sheffey, George M. Cochran, Jr., and William Anderson, on the 19th of June, 1880, is confirmed, so far as the sale and the amount agreed to be paid on account of the sale of the property therein referred to is concerned, to C. R. Mason, at the

price of one hundred and thirty-four thousand dollars; but so much of said decree as authorizes and directs a conveyance of the said Rockbridge Alum Springs property, comprising the Alum Springs tract property, of six hundred and fifty-two acres, and the Ailstock and Dunlop tracts with their appurtenances; and so much of said decree as authorized any receipt to C. R. Mason for any money on account of his said purchase, or as directed, any distribution of the proceeds of sale is erroneous, and is reversed and annulled; and so much of all the decrees in these consolidated causes as decreed costs against the appellant, James A. Frazier, and so much of all the decrees in the said causes as allowed a salary to William Frazier, managing and surviving partner of the firm of Frazier, Randolph and Frazier, for compensation as such managing and surviving partner; and so much of said decrees as allowed to William Frazier any commissions on his transactions, as administrator of John W. Frazier, for the years 1853 and 1854; and so much of said decrees as scaled twenty-five hundred dollars, Confederate money, used by said William Frazier, and thus paid to himself; and so much of said decrees as ratified and approved the investment by said William Frazier of the funds in his hands, in what is called cotton-bonds of the Confederate States government; and so much as charged the estate of John W. Frazier with interest on overdrawn amounts during the years from 1854 to 1867 inclusive, excepting the year 1861; and so much of said decrees as allowed commissions or interest on the annual advancements by him as managing and surviving partner to the estate in his hands as administrator; and so much of said decrees as is in conflict with the foregoing opinion, and the principles herein declared, is erroneous. Therefore it is decreed and ordered that so much of the said decrees as is in conflict with the foregoing opinion of this court, and the principles herein declared, be reversed and annulled, and that the appellant recover against the appellees his costs by him expended in the prosecution of his appeal aforesaid here.

And this court, now proceeding to enter such decree as the

Decree.

said circuit court ought to have rendered, doth adjudge, order and decree, that neither the said William Frazier nor J. N. Hendren, trustee, had any valid claim to any portion of the fund arising from the sale of the said Rockbridge Alum Springs property, including the Ailstock and Dunlop tracts of land, and that, to the extent the said Rockbridge Alum Springs Company sought to discharge its liability as substituted purchaser of the said property, by using the claims assigned to it by the said J. N. Hendren, trustee, amounting to the sum of $57,629.41, as of October 1st, 1880, the purchase money on account of said sale is due and unpaid, and that the said sum so remaining due and unpaid is due and payable to the said James A. Frazier. And it is further adjudged, ordered and decreed, that the said Rockbridge Alum Springs Company do pay to the said James A. Frazier the said sum of $57,629.42, as of October, 1880, which said sum is hereby declared to be a lien on the said Rockbridge Alum Springs property, including the said Ailstock and Dunlop tracts of land, in favor of the said James.A. Frazier. And this cause is remanded to the said circuit court of Augusta county, with instructions to enter a decree for the resale of the said property, to satisfy the lien aforesaid, upon the same terms as those prescribed in the decree of November 13th, 1874, unless within ninety days after the entry of this decree in the said circuit court the said Rockbridge Alum Springs Company do pay to the said James A. Frazier, or to his assigns, the said sum of $57,629.41, as of the 1st of October, 1880; which is ordered to be certified to the said circuit court of Augusta county.

DECREE REVERSED.