## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

### FRAZIER v. HENDREN.

MARCH 12th, 1885.

Absent, *Hinton,* J.

1. JUDICIAL SALES—*Purchaser.*—Re-sale having been directed of certain Springs property for default of payment of the purchase money where-for M. as surety for F. was bound, M. contracted with parties having interests in said property to buy it, and form a joint-stock company to manage it. To this company as the purchaser the sale was made, reported and confirmed, and the property conveyed; and the contract being before the court with the report of sale, M. was treated as the agent of the company.

HELD:

M. was not personally liable as purchaser.

2. VENDOR'S LIEN—*How extinguished.*—Such lien may be extinguished by payment of the purchase money, or it may be waived or surrendered by the voluntary act of the vendor. Case at bar is an instance of such extinguishment of lien.

3. JUDICIAL SALES—*Case at bar.*—Part owners and lienors of the Springs property agreed, as a joint-stock company, to buy it, and to pay off the claims on it in the stock and bonds of the company. They so bought it, and the agreement was returned to the court with the report of the sale,—certain other creditors, not parties to the agreement, assenting to it.

HELD:

The purchaser's liability was to pay *money*, and it cannot be discharged in any other thing, *quoad* any party in interest, against his wishes.

4. SETOFFS—*Case at bar.*—In *Frazier* v. *Frazier,* 77 Va. 775 (to which case at bar is sequel), a certain sum was held due J. A. F., and to be a lien on the property of the R. A. Springs company, and that property was

directed to be sold in default of payment. When the case went back the company brought in as setoffs to that sum, certain judgments against J. A. F. Upon appeal by him :

Held :

1. These judgments were lawful setoffs against the decree.
2. The decree in *Frazier* v. *Frazier* is without error and will not be disturbed, except so far as the costs were given against the appellees generally, when they should be against only W. F. who alone of the appellees had contested the rights of the appellant.

Appeal of James A. Frazier from two decrees of circuit court of Augusta county, entered July 3rd, 1884, and November 22d, 1884, respectively, in the cause of *Frazier* v. *Frazier* (77 Va. 775), after it had been sent by this court back to the circuit court by the decree of October 11th, 1883, and the several petitions of Mason and others for the rehearing of the decree last aforesaid. Opinion states the case.

*F. S. Blair* and *Jos. Christian*, for James A. Frazier.

*Sheffey & Bumgardner* and *G. M. Cochran*, for Orson Adams, receiver, John T. Randolph, and the R. A. Springs company.

*T. C. Elder*, for C. R. Mason.

*W. A. Anderson*, for Campbell's adm'r.

Lewis, P., delivered the opinion of the court.

This case is before us on the petitions, respectively, of C. R. Mason, James Campbell's administrator, Orson Adams, receiver, and others, for a rehearing of the decree of this court, entered on the 11th of October, 1883, on the former appeal in this case, under the style of *Frazier* v. *Frazier et als.*, and also on appeal allowed James A. Frazier from two decrees of the circuit court of Augusta county, rendered after the case was removed to that court.

The main facts connected with the history of this protracted litigation, are set forth in the opinion of the court on the former appeal, reported in 77 Va. 775, and need not be again adverted to, further than is necessary for a correct understanding of the questions now before the court.

On the former appeal certain questions, affecting the rights of parties other than the principal parties to that appeal, were not brought to the attention of the court in the arguments of counsel, and certain parts of the record pertaining to those questions were then wanting, which are now supplied. Those questions are important, and have been ably discussed by counsel, and carefully considered by the court.

We will first dispose of the question as to the liability of C. R. Mason, as purchaser of the Rockbridge Alum Springs property, at the sale thereof in June, 1880. It appears, that at a former sale of the property, under a decree of the court, in September, 1868, James A. Frazier became the purchaser, at the price of $236,000, with M. G. Harman as his surety. Afterwards Harman withdrew as surety, when Mason, for the accommodation of Frazier, became his surety in Harman's place. Frazier, however, being unable to make the deferred payments as they fell due, a decree directing a re-sale was entered at the November term, 1879. And Mason having thus become bound as surety, and being anxious to protect himself, if possible, against loss on that account, entered into agreements, prior to the day of sale, with certain persons who were part owners of the property, or the holders of liens thereon, to unite with him in the formation of a joint-stock company for its purchase, he agreeing to take stock in the company to the amount of $7,500, to be paid for in cash. These agreements were reduced to writing, and were afterwards filed as exhibits with the report of sale.

It appears from these exhibits: 1. That Mason agreed to buy the property at the then advertised sale, provided it could be bought at a price not exceeding $135,000; 2. That Mason was

thereafter to obtain a charter of incorporation for the proposed company, to be known as the Rockbridge Alum Springs Company; 3. That certain of the parties agreed to accept, and that Mason agreed to cause to be issued to them paid up shares of stock in full discharge of their claims on the property; and 4. That to secure the payment of other claims, payable out of the proceeds of sale, a deed of trust should be executed on the property by the company when organized, and that bonds secured thereby should be issued in two classes, the first to discharge the vendor's lien in favor of James Campbell's administrator, and the second to be used in paying off other claims against the property, or the fund to be realized from its sale. The administrator and distributees of Campbell's estate acceded to this arrangement, as did other creditors who were not formal parties thereto.

At the sale, the property was knocked off to Mason, as the highest bidder, at the price of $134,000, and soon thereafter the agreements aforesaid were fully carried out on his part. The company was duly chartered and organized, and stock and bonds issued as stipulated. The terms of the agreements between the parties were made known to the commissioners of sale, who accordingly dealt with Mason as a mere agent or trustee, and so reported to the court, filing with their report the agreements as exhibits. "From these exhibits," they said, "it will be seen that C. R. Mason really purchased the property as trustee for the parties to whom over one-half of the $131,298.32 due upon the property, as of June 16th, 1880, is payable, and that parties entitled to over $47,000 of the residue of the fund have agreed to accept the mortgage bonds to be issued as provided for in the contract * * * in discharge of their respective claims against the property and the fund as they stood on the day of sale." And in its decree of July 3rd, 1880, confirming the sale, and in the subsequent decree of November 30th, 1880, Mason was treated by the court as a trustee for the parties, and the Rockbridge Alum Springs

Company as the real purchaser, to which the property was afterwards conveyed, by a special commissioner under the direction of the court.

It will thus be seen that Mason has fully performed the agreement on his part, and has acted and been dealt with throughout as an agent merely. It is plain, therefore, that he can be regarded in no other light than as a nominal purchaser, liable in no aspect of the case to any of the parties to this suit, and that the circuit court properly so held. Indeed, the question was in effect decided by this court on the former appeal, in decreeing, as it did, directly against the company in favor of the appellant, for the sum ascertained to be due him.

The next question relates to the *status* of the Campbell lien. It appears that in 1851, James Campbell sold the Rockbridge Alum Springs property to Booth, Anderson and Christian, and retained the legal title as security for the payment of the purchase money. In the following year, the property was sold by Booth, Anderson and Christian to John W. Frazier, who afterwards sold a fourth interest therein to John T. Randolph and William Frazier, respectively. In 1860, after the death of James Campbell, his heirs at law by deed, deposited as an *escrow*, conveyed the legal title to James A. Frazier, the appellant here, as the sole heir at law of John W. Frazier, who in the meantime had died, the deed to be delivered upon the payment in full of the balance of purchase money due to Campbell's estate. After the purchase of the property by Mason, for the Rockbridge Alum Springs Company, and the confirmation of that sale, the mortgage bonds of the company to the amount of the unsatisfied vendor's lien, were accepted and receipted for by the administrator of Campbell, in full satisfaction of the lien, and thereupon the deed of the Campbell heirs to James A. Frazier, was by the decree of November 30th, 1880, ordered to be delivered to the company as the purchaser of the property.

By the decree of this court, of the 11th of October, 1883, it

was adjudged that out of the proceeds of the sale James A. Frazier was entitled to be paid the sum of $57,629.41 as of October 1st, 1880. This sum was declared to be *a lien* on the property, and accordingly the deed of the special commissioner to the company was set aside and annulled; and it was further decreed and ordered, that unless the company should pay to Frazier, within a specified time, the sum thus ascertained to be due him, the property should be re-sold to pay the same.

In this state of things, it is now insisted by Campbell's administrator that inasmuch as the bonds of the company were accepted by him in discharge of the vendor's lien, in the belief that the deed of trust to secure their payment constituted the first lien on the property, paramount to the claims of all other persons—which expectation has been disappointed—the vendor's lien ought to be restored, or at least that Frazier's lien ought to be postponed to that in favor of the Campbell estate.

It is undoubtedly true that a court of equity will never compel a vendor to part with the legal title until the purchase-money has been paid, or the lien therefor has been waived or extinguished. It has been said to be a natural equity, that when land is sold it should stand charged with the unpaid purchase-money, and that a court of equity considers a debt as never discharged until it is paid to the proper person and by the proper person. 2 Min. Insts., 190; *Watts* v. *Kinney*, 3 Leigh, 272; *Knisely* v. *Williams*, 3 Gratt., 253; *Yancey* v. *Mauck*, 15 Id., 300: *Coles* v. *Withers*, 33 Id., 186.

But, as was justly observed by the learned judge who heard this case in the circuit court, persons holding liens may surrender and lose them by their own voluntary act; and that the vendor's lien in the present case has been waived and extinguished there can be no doubt. This is shown by the agreement of the administrator to accept the mortgage bonds of the company in satisfaction of the lien, his subsequent acceptance of the bonds, and his receipt in full, and by the decree, entered

.without objection, directing the deed of the Campbell heirs to be delivered to the purchaser.

It is contended, however, that the relation of the parties having been disturbed by the decree of this court, the vendor's lien ought to be kept alive to prevent injustice to those whose claims prior to that decree were superior to those of James A. Frazier.

This argument in a court of equity would be irresistible if the course and conduct of the parties in changing their original position had been in any way influenced by him. But in truth it was not. On the contrary he said nothing and did nothing by which directly or indirectly the parties were induced to act, or by which he ought to be held estopped from controverting their claim to a lien paramount to his own. It is true he was originally a debtor of the Campbell estate for the unpaid purchase-money, and that after the sale in September, 1868, when he became the purchaser of the property, he became the debtor of all the parties interested in the property or in the proceeds of sale. But this relation was changed when, at the last sale, in June, 1880, the Rockbridge Alum Springs Company became the purchaser, for a sum equal to that due by him on account of the first sale. Then it was, as determined by the decree of this court, that the company became the debtor, and he a creditor of the fund to an amount exceeding $57,000. It is also true that when the vendor's lien was released, he was supposed to be entitled to no interest in the property, nor to any part of the proceeds of sale. But it is equally true that the parties acted with knowledge of his legal right to appeal from the decrees of the circuit court, and therefore took upon themselves the risk of an appeal and its consequences. And having thus acted freely and voluntarily, with their eyes open, and without fraud or imposition or influence of any kind on the part of James A. Frazier, they are not now entitled as against him to be released from their own voluntary contracts, because,

in the light of subsequent events, those contracts were incautiously and injudiciously entered into.

The same considerations apply with equal force to the position of Orson Adams, receiver, a judgment creditor of John T. Randolph, and with greater force to that of Randolph himself. The former agreed to accept the bonds of the Rockbridge Alum Springs Company, in satisfaction of his claims, which were duly delivered to him, whereupon he executed a receipt in full, and assigned his claims, without recourse, to the company. The latter became one of the incorporators in the company, pursuant to his agreement to receive its stock in satisfaction of his claims, which were accordingly transferred by him to the company.

It is true, that in the opinion of this court, on the former appeal, it was said that the charge on the property in favor of the appellant would be second in dignity to the Campbell lien only, and of equal dignity with the Randolph debt. But no such provision is contained in the decree. The truth is, the controversy was virtually between the appellant, on the one hand, and the appellee, William Frazier, on the other; and the question was not discussed, nor even alluded to, in the arguments of counsel. Moreover, the record, as it then was, while it pointed to the agreements between the parties to surrender their liens for the bonds and stock of the Rockbridge Alum Springs Company, did not contain, as it now does, the report of the commissioners of sale, and the accompanying exhibits, showing those agreements in detail, and the acts and receipts of the parties in pursuance thereof. It is not strange, therefore, that the question as to the relative priorities of the liens, should not have received the mature consideration of the court. Now, however, the facts very fully appear in the record, and in the light of all the facts, as they now appear, we are constrained to conclude that the lien of the appellant is paramount to all others; and that it is so: 1. Because, as we have seen, the vendor's lien has been relinquished by the voluntary act of the parties themselves; and 2. Because,

as was held by the circuit court, " the liens of Randolph and others, in like case, with him are gone, lost and merged in their new attitude of share-holders in the Rockbridge Alum Springs Company," which is now the debtor no less of James A. Frazier than of Campbell's administrator. The latter proposition would seem to be self-evident.

The next question was raised by the company. It contends that its contract was to pay, not in money, but in the claims of various parties on the property, and that it cannot therefore be compelled to pay in money any part of the price for which it became the purchaser. But this position is not well taken. The decree of resale directed the property to be sold for *money*, on the terms of ten per cent. of the purchase money to be paid in cash, the residue in equal installments at one, two, three, four and five years, respectively, from the day of sale, and the purchaser to execute bonds for the deferred payments, with good personal security. These terms were duly advertised, and at the sale, with the exception of a small tract of mountain land of comparatively little value, the property, which in 1868 was knocked off to James A. Frazier for $236,000, was sold to Mason, as agent, for $134,000. To the arrangement between the company and those having claims against the property, the court, though informed of it, was in no sense a party. And hence it is clear that the obligation of the company was to pay in money, and could not, therefore, be discharged, without the sanction of the court, otherwise than by a payment in money, as against any creditor of the fund without his consent.

In this connection, the case of *Harman* v. *Jordan*, is referred to by counsel. That case was decided by this court in 1872, but was never reported, nor is the opinion to be found among the records of the court. The facts in this case were substantially these: Harman was decreed to be entitled to a debt amounting to $10,000, which constituted the first lien on certain property of which he afterwards became the purchaser

under a decree of the same court. After the sale it was determined that he was entitled to one-third only of the ·debt in question. .Thereupon, claiming to have been induced by the first decree to buy the property, and to bid therefor a higher price than it would otherwise have brought, he insisted that he ought to be released from his bargain. But the circuit court held otherwise, and on appeal the decree was reversed; this court holding that the appellant, the purchaser, ought to have the option of having the sale to him confirmed or set aside, and a new sale ordered, which option was accordingly tendered him.

It is obvious that the principle on which that case was decided has but little application to the case in hand. Here nothing was adjudicated in favor of the Rockbridge Alum ·Springs Company, except to confirm to it the sale that had been made. The price at which it obtained the property was reported to be a fair one, though greatly less than the sum bid for it at the previous sale. And if, in the discharge of its obligations, the claims of certain persons supposed to be good were used as cash, such claims were assigned and accepted, subject to the rights of the appellant, who, being no party to the arrangement, could not be bound thereby.

The next question arises on the present appeal from the decree of July 3, 1884, in respect to the Hendren judgment. It appears that these judgments were recovered against James A. Frazier and William Frazier on certain negotiable notes, drawn by the former, and endorsed as surety by the latter. They were paid off by Hendren, trustee, in a certain trust deed for the benefit of William Frazier's creditors, and now inure to the benefit of the Rockbridge Alum Springs Company. They were not embraced in the accounts between the parties, and consequently were not and could not have been passed on by this court on the former appeal. The main controversy then related to the transactions of William Frazier in respect to the purchase and management of the springs property, and as

guardian and administrator. The decree of this court ascertained the balance due the appellant on account of those transactions, and directed a resale of the property in default of its payment.

After the case went back to the circuit court, the judgments in question were brought in by petition as evidence of payment *pro tanto* of the sum decreed against the company, and were allowed as such. So far as the record discloses, no objection was raised by the appellant as to their validity or binding force and effect, but the objection to their allowance as a credit seems to have been based on the sole ground that the circuit court was charged with the mere ministerial duty of entering the decree of this court, and nothing more. Under these circumstances, therefore, the validity of the judgments and their assignment not being disputed, they were properly allowed in favor of the company. The property of the company was ordered to be sold only in the event it should fail to pay off the lien of the appellant within a specified time; and it appearing to the court that to the extent of the undisputed judgments that lien had been discharged, it was proper that the company should be credited accordingly. And in so decreeing, the circuit court did not depart from the terms of the mandate of this court, but proceeded in accordance therewith.

It is true the decree of this court settled the rights of the parties as to the sum due the appellant, and left nothing on that subject to be adjudicated by the circuit court. But it cannot be contended that if, after the entry of that decree, the company had fully paid the appellant's lien in lawful money, it would not have been entitled to show that fact to the circuit court as evidence that the decree had been satisfied. And if not, why should it not be entitled to the benefit of undisputed offsets as equivalent to payment in part? There is no distinction in principle between the two cases, and the decree of the circuit court is therefore plainly right.

The appellant, however, now contends that at the time the

judgments were recovered, and afterwards when they were paid off by Hendren, trustee, William Frazier was indebted to him in a sum in excess of the aggregate amount of the judgments, apart from the sum decreed in his favor against William Frazier by this court, and that the fact is apparent from the record as it was on the former appeal. On the other hand, it is contended that by reason of a clerical error in the accounts as they appear in the record, amounting to the principal sum of $1,000, and other credits to which those representing by assignment the interest of William Frazier are entitled, the balance so decreed is in excess of the correct amount due the appellant.

In the opinion of the court on the former appeal, it was said, that a sum exceeding $57,629.41 was due the appellant, but for reasons then stated the sum decreed in his favor was limited to that sum. We are of opinion that by that decree substantial justice has been done the parties, and that there is no reason for altering it, except in respect to the payment of costs. The controversy, as before said, was between the appellant, on the one hand, and William Frazier, and those claiming under him, on the other. The decree, however, imposed costs on the appellees generally, thus doing injustice to those of the appellees who were not contesting the claims of the appellant. It will, therefore, be amended in this particular, and the costs will be decreed against William Frazier and Hendren, trustee.

Objection is also made to the last of the decrees appealed from in respect to the appointment of commissioners of sale. The appellant complains that a majority of the commissioners are counsel in the cause, representing interests hostile to his own. But this objection is not well founded, in view of the number of parties having separate and distinct interests, and the further fact that of the five commissioners two are the counsel of the appellant.

We are, therefore, of opinion to amend the decree of this court in the particular indicated, and to affirm the decrees of the circuit court.

FAUNTLEROY, J., and RICHARDSON, J., concurred.

LACY, J., dissenting, said:

I dissent from the opinion of the majority. The effect of the majority opinion is to destroy the vendor's lien of the Campbells. James Campbell sold the property in question to Booth, Anderson and Christian, and retained the title. Frazier's father, John W. Frazier, bought this property of the said Booth, Anderson and Christian, and the title was still reserved in the Campbells. The purchase money has never been fully paid to the said Campbells, and one of their vendees cannot claim any title to this property superior to theirs until he has paid the purchase money. When John W. Frazier bought of the vendees of the Campbells, he sold one-fourth of the same to Wm. Frazier, his brother, and one-fourth to Jno. T. Randolph, who is his kinsman, retaining one-half himself. His one-half descended to his son, James A. Frazier, who was an infant of tender years at the time of his father's death. William Frazier assumed the position of guardian for James, and administrator of John W., deceased, and assumed control of the Rockbridge Alum Springs as surviving and managing partner, and held the two last named positions for many years—having soon been removed as guardian.

The opinion rendered at the first hearing of this case, reported in 77 Va. Rep. 775, sets forth how James F. suffered at the hands of this managing partner, and administrator of his father, and upon a correction of errors a sum due to William Frazier was subjected to compensate James A., and a sale of the property ordered to pay it; and the lien which William Frazier or his assignees had, retained for the benefit of James A. Frazier. But there was no controversy between James A. Frazier and the Campbells; their lien as the original vendors was respected, so far as it remained unpaid, and held to be the

first lien on the property, and the liens of Randolph and James A. Frazier were recognized as standing upon an equal footing. And this was inevitable, because, in all the assignment of errors here, and in all the long litigation between the two Fraziers, there had never been any hint of any denial of the right of the Campbells to have payment of their money, for which their property had been sold, before the purchaser could demand the title to it; and there was no hint of any dispute with Randolph; he had never been administrator of John W. Frazier, nor managing partner; he was simply one-fourth owner, as William Frazier was, and James A. Frazier, claiming under his father, was one-half owner.

But we have now arrived at a point when we are told that the Campbells have lost their lien, and Randolph his. How? If John W. Frazier were alive, under whom alone James A. has any rights, Campbell would hold the prior lien, *against* which John W. Frazier could offset nothing, because he had no rights except and *under* it, as Campbell's vendee, and when the Campbell's lien was paid, Frazier would have what Campbell formerly had, by reason of his purchase of the same.

But we are told the Campbell debt is not extinguished, but the lien is gone, and James A. Frazier, his vendee, has come to hold a lien superior to his vendor's lien; that is, something superior to the source of his title. He, or his father, bought what the Campbells had, at an agreed price; the price has never been paid, but he has what he bought, without paying the purchase price, and the Campbells have not the price at which they sold their property, but something else, which is inferior to what Frazier has fallen heir to, by a sort of law legerdemain. How did Frazier manage to get his position, and that of the Campbells, his vendors, thus shifted? Once their positions were undisputed, and Campbell was the owner of the property, and Frazier had no concern with it.

But the Campbells sold their property, and retained the title until the purchase money had been paid in full; the purchase

money has never been paid in full; and the Campbells have never released their lien to Frazier. The opinion of the majority points out how this transformation has been effected.

Let us look at it! The springs were sold for division and distribution. James A. Frazier became the purchaser and paid his one-half interest credited to him. He was unable to pay for the property, and it was resold and bought by C. R. Mason, who sold to the Rockbridge Alum Springs Company. The circuit court confirmed the sale, and the Campbells took for their first lien, from this company, first mortgage bonds on the property. The other parties in interest took shares of stock for their respective interests, and the sale being confirmed, and the proceeds thus distributed, the cause was removed from the docket. James A. Frazier appealed, and this court, proceeding to correct errors assigned and complained of against him in the settlements between his, and his uncle William's interest, decided in effect that the share which his father's administrator had in the sales to the Rockbridge Alum Springs Company belonged to James A. Frazier, because of errors in the settlements between them; and limited the amount of his recovery to the precise and exact amount due William Frazier from the Rockbridge Alum Springs Company, and decreed that it should be a lien on the property second only to the Campbell lien, and of equal dignity with the Randolph lien; that is, that it occupied precisely the same relative position as to Campbell and Randolph which William Frazier's interest did, and which John W. Frazier's interest did. The litigation was between James and William Frazier, and whatever restitution was to be made to James Frazier was to be taken out of the interest of the person at whose hands he had suffered injury. I thought then and I think now this was just. But it has been strenuously argued here by the counsel for James Frazier that such is the depreciation of the property in question, that at a sale now it will sell for but little more than enough to pay the vendor's lien of the

Campbells. This ought not to be considered in the determination of this case.

It must be remembered that the Rockbridge Alum Springs Company did not contract to pay William Frazier money for his interest, nor did it agree to pay money to the Campbells. The agreement was that the *creditors* of *James A. Frazier*, other than the Campbells, should associate themselves together and buy the property, the Campbells to receive first mortgage bonds of the company, delivering their deed to the said company; and it is thus claimed that they relinquished their lien to the company. But they have not released it to William nor to James Frazier. It is the first lien now on the property in the hands of the company, and where the shares of stock of William Frazier are cancelled by order of this court, and money in equal amount decreed to be paid to James Frazier by the company, which is something the company never agreed to pay William Frazier or any body else, and held to be a lien on the property; how will the court manage to hold up the Campbell lien long enough to put the Frazier lien under it?

Is there any equitable principle upon which this can be done, other than some equity which will affect the Campbells as between themselves and the Fraziers? I think not! How can Frazier claim to hold the property of the Campbells without paying for it, by asserting that somebody else bought it and did not pay for it?

All this is an unfounded contention. The Campbells delivered their deed to this purchaser at this judicial sale *upon condition*, that their first lien was preserved, and the sale confirmed to the purchaser as made. This court sitting upon the cause precisely as the circuit court did, and proceeding to enter such decree as the circuit court ought to have entered, cannot say that it will defeat the condition upon which the Campbell deed was delivered; and while the court puts it out of the power of the purchaser to comply on its part with the condition, by setting up another first lien never contemplated between the

parties, and yet hold on to the deed of the company, not for the benefit of the purchaser to whom it was thus delivered, because if for its benefit, it is still the first lien on the property, but for the benefit of a party to whom the Campbells never owed a dollar in this whole controversy, but whose creditors they are, now as ever; for it is not pretended that either Frazier has paid them the purchase money due them.

It is erroneous to speak of the lien of the Campbells being lost, gone and extinguished. It has never been so extinguished by any act of theirs, and certainly never in favor of Frazier, for whose benefit it is now used.

What has been said applies by similar reasoning to the Randolph interest. If Frazier has acquired a lien superior to Randolph's, how did he get it? Not by any act of these parties. They once held shares of equal dignity, and were co-partners. The sale at which this purchaser bought was a sale to pay the amounts due by James Frazier, as purchaser, to Randolph, and thus his obligation to pay William Frazier has been extinguished by a counter claim. But how did he extinguish his obligation to pay Randolph his share? He has never done so at all. It has never been pretended in this suit that Randolph owed him anything; and how does he get released, in the first place, from the obligation to pay Randolph his share of the property by showing offsets against William Frazier? In the second place, how does he get a prior lien on this property, as to Randolph, by any recasting of accounts between him and somebody else?

When the Rockbridge Alum Springs Company purchased this property, it was *in effect* a purchase by the creditors, who agreed to hold shares of joint-stock in the like proportions and relations as their debts stood. The Campbells agreed to deliver their deed to the property, upon *the condition* that their first lien was preserved to them in the form of first mortgage bonds of the company. If this arrangement was erroneously sanctioned by the circuit court, and this court feels called upon to

set aside the arrangement, as made, should not the parties be restored to the *status quo ?* Can it be set aside upon any other terms?

Did the circuit court have any power or authority at that time to compel the parties to make any other contract than such as they agreed to make? And if not, can this court now do it, and say it is proceeding to enter such decree as the circuit court ought to have rendered? If at that time the circuit court had substituted James Frazier to the rights and interests of William Frazier, as this court has since done, and James Frazier had declined, as he now declines, to receive shares of stock for his share of the fund, the circuit court could not have compelled him to do so, and this court cannot now compel him to do so against his consent.

But if he had refused to unite with the others, the transaction would have failed altogether, and the circuit court could not, as this court cannot now, compel the others to go into the arrangement against their consent, then the sale could not have been made by the circuit court, as it was made, and this court cannot now say that the circuit court should have so decreed, and cannot so decree, saying this court is now proceeding to enter such decree as the circuit court should have entered, because the circuit court could not have entered any such decree by any possible view of the case.

What, then, if the circuit court had done what this court has since declared it should have done, and put James Frazier into the place of William Frazier, at that time would have been a proper decree for the circuit court to have entered? Answer that question, and you have the answer to the question: what decree should this court now enter here?

James Frazier, thus enlarged by the recovery from William Frazier, would have stood before the court as the purchaser of the Springs, owing $132,000, less $57,629.41, that is, $74,370.59, and the owner of the Springs when that was paid. If he could have sold the Springs for $132,000, he would have been enti-

tled to keep the $57,629.41, and been obliged to pay to Campbell, Randolph and others, $74,370.59. If neither this, nor any other purchaser had appeared, the court ought to have made the sale, to satisfy the debt of $74,370.59 still unpaid of the purchase money due by James Frazier, out of which the Campbells would have been *first* paid. If, however, this agreement had then been entered into by the parties, it should have been enforced by the court, but enforced *as made.* The circuit court had, and this court has, the power to enforce no contract except such as the parties thereto entered into and agreed to.

That court had, and this court has, no power to make a contract for these parties. This cannot be denied. It may then be asked, did these parties, first or last, at any time whatever, make the contract set up for them in the decision of the majority? If so, when and how did the Rockbridge Alum Springs Company ever agree to pay James Frazier or William Frazier, or any other person, $57,629.41 in money? Never, anywhere, at any time. When did the Campbells ever agree with any person to release their first lien on this property; if so, to whom and when? They contracted for the lien of first mortgage bonds; the other parties all agreed to preserve their lien thus. But this court now says that the circuit court ought to have entered a decree to put their vendee in their lien and stead as to their own property, without the payment on his part of the purchase money.

In writing and delivering the opinion of this court at the first hearing, concurred in by all the judges, I used plain words to show my meaning on this point, declaring that the lien of James A. Frazier "was second only to the Campbell lien, and of equal dignity with the lien of Jno. T. Randolph." That is, what was found due to him was due to him, exactly as what was due to William Frazier was due to him, and that it was due to him just as his original interest was, that is subordinate to his vendor's claim against him.

This court has the power to set aside that decree and opinion

as erroneous, a re-hearing having been asked within the prescribed time. Whatever errors are therein should be corrected, but there is no opportunity to base one upon the other, for both are recorded and speak for themselves. The wrongs of James A. Frazier are properly redressed only against the party by whom he has suffered injury or loss; but as against the Campbell and the Randolph claims, &c., he has asserted no wrong and asked no redress.

The purchase of C. R. Mason was upon an arrangement with the creditors and persons in interest other than James A. Frazier. I dissent from the opinion in so far as it holds Mason a mere nominal actor upon the scene. Whatever his first connection with the case, he bought the property at a price certain but little over half of what James A. Frazier had bought it at some years before. That sale was to compel James A. Frazier to make good his purchase, or suffer a sale of the premises. Why should not the same rule of procedure and of responsibility attach to Mason as to James A. Frazier, with whom he had made no arrangement for his share? Mason bought the property, and the court confirmed it to him.

Now, if Mason paid, by an arrangement, the debts of all the parties in interest by getting up a company and taking some stock, and paying off in stock, except the Campbells, who did not take stock, and James A. Frazier, who did not take any thing, but got a decree of this court for what was supposed to belong to William Frazier, why should not Mason be held responsible, so far as he agreed to be held, for $134,000, part to the Campbells in first mortgage bonds, stock to those who agreed to take stock, and money, or what he could use, to satisfy James A. Frazier's interest; and if a re-sale is necessary, why is not Mason bound to make good his $134,000, or pay the difference. He did not make any arrangement with James A. Frazier. He agreed, so far as James A. Frazier is concerned, to pay $134,000 for the property; and upon a re-sale he should have credit for the interests he had paid, or which the Rock-

bridge Alum Springs Company, his substitute, has paid, and be charged with the residue for which the property is responsible.

As to Randolph, and others situated like he is, if the purchase of the company stands, he has taken stock, but if this court overturns and destroys the company, so that there is no company, then his rights survive against the Springs property; and if Mason is protected as to his share, it is solely because of some contracts which they have mutually made.

But as the Campbells never agreed to take any thing but a first lien, they still have it. So James A. Frazier, who never agreed to take anything but money for his share, and stood off upon his legal rights, as he had a right to do, so his interest, as ascertained in this court, survives to him, and his interest is due to him without any reference to what was the convention between Mason and William Frazier. Mason was his security on the first purchase, and when their interests became divergent, Mason had a right to look out for himself, and buy at $134,000 the same property James A. Frazier had bought at $232,000 a few years before.

James A. Frazier could demand only his legal rights, and these being ascertained without a sale, his interest would be credited to him as purchaser, but after a sale, become part of the purchase money, and are due by the purchaser to the person to whom it is due; and if C. R. Mason is held to be bound for the amount due James A. Frazier, it must be inside of and in accordance with the terms of his purchase.

I think the settlements between James A. and Wm. Frazier in this court on the former appeal were final as between them, and that the circuit court erred in allowing the account to be re-opened for items claimed to be omitted.

The decision as to costs in this case is a solecism. If the parties were not interested in the appeal, let it be explained how they lost their interest by the appeal. They were not properly held liable for costs, because they were not contesting the claim of the appellant, and so they must not pay any part of

the costs; but yet the effect of the decree in the suit in which they were parties, only nominally, is to deprive them of their entire interest in the property. This I say is a solecism.

I dissent from the opinion entirely, on every point. I have thus briefly written out my views in the case that my attitude may be understood when the two appeals are considered together. I feel that my views are correct and just to all the parties in interest, so that each party may stand by the consequences of his own contract and no other.

DECREE AMENDED AND AFFIRMED.